# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### MARTINSBURG

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                    CRIMINAL ACTION NO.: 3:16-CR-31
                                             (GROH)

BRENT JACKSON, STEVE CRITES,
JAMES MELVIN CRITES, BETTY
CRITES, KRISTY VANDUZER,
LARRY WEBSTER and JAMES R.
CRITES, a/k/a "JAY,"

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

Currently before the Court is a Motion to Dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) filed by the Defendants on February 3, 2017. ECF No. 159. The Government filed a Response on February 9, 2017. ECF No. 161. On February 10, 2017, the Defendants filed an Amendment to their motion, to include copies of contracts between Kids Against Drugs ("KAD") d/b/a Big Bucks Bingo of Berkeley County and two different charities. ECF No. 163. On February 15, 2017, the Defendants filed a motion for leave to file reply [ECF No. 164], which the Court granted on March 7, 2017. ECF No. 172.

## I. INTRODUCTION

The Defendants were originally charged in a fifty-three-count indictment in which they are alleged to have committed mail fraud, conspired to launder money, aided and abetted money laundering, aided and abetted unlawful monetary transactions and operated an illegal gambling business. In a prior Order, the Court dismissed count fifty-three for lacking adequate specificity. See ECF No. 126. The Defendants' instant motion asks this Court to dismiss the indictment in its entirety because the alleged conduct charged in the indictment does not state a violation of the federal mail fraud statute. The Government argues that the requisite elements for charging the Defendants with mail fraud have been satisfied, and the indictment should not be dismissed.

## II. LEGAL STANDARDS

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "One of the principal purposes of an indictment is to apprise the accused of the charge or charges leveled against him so he can prepare his defense." United States v. Fogel, 901 F.2d 23, 25 (4th Cir. 1990). The Fourth Circuit has upheld as sufficient indictments that did not allege specific acts in violation of cited statutes. See, e.g., United States v. Kelly, 462 F.2d 372, 374 (4th Cir. 1972) (finding that an "indictment, basically in the words of the statute, contained a sufficient statement of every essential element of the crime charged to enable defendants to present their defense").

To be found constitutional, "an indictment must (1) indicate the elements of the offense and fairly inform the defendant of the exact charges and (2) enable the defendant to plead double jeopardy in subsequent prosecutions for the same offense." United

States v. Williams, 152 F.3d 294, 299 (4th Cir. 1998); see also Hamling v. United States, 418 U.S. 87, 117 (1974) (finding that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense" (internal citations omitted)).  These criteria make certain that a defendant enjoys his or her constitutionally guaranteed rights "under the Fifth Amendment, which provides that a defendant cannot be prosecuted for a capital or infamous crime except on presentment or indictment of a grand jury, and under the Sixth Amendment, which provides 'that a defendant must be informed of the nature and cause of the accusation against him.'"  United States v. Darby, 37 F.3d 1059, 1063 (4th Cir. 1994) (quoting United States v. Daniels, 973 F.2d 272 (4th Cir. 1992) (internal quotations omitted)).  If an indictment is missing any essential element of the offense, it is invalid, and a bill of particulars cannot cure the defect.  United States v. Loayza, 107 F.3d 257, 260 (4th Cir. 1997).

Under Rule 12(b)(3)(B)(v), a defendant may move to dismiss an indictment on the ground that the indictment fails to state an offense.  "In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment."  United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002). "A motion to dismiss an indictment can be determined before trial 'if it involves questions of law rather than fact.'"  United States v. Cortez–Ruiz, No. 15-CR-00114-LHK, 2016 WL 7034057, at *2 (N.D. Cal. Dec. 2, 2016) (quoting United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986), cert. denied, 478 U.S. 1007, (1986)).

"An indictment is sufficient if it . . . enables the Court to determine whether the facts alleged are sufficient in law to withstand a motion to dismiss or to support a conviction." Winer, 323 F. Supp. at 605 (citing United States v. Fargas, 267 F. Supp. 452 (S.D.N.Y. 1967); United States v. Luros, 243 F. Supp. 160 (D. Iowa 1965); see also Rule 7(c) Fed. R. Crim. P.).  The Supreme Court has long held that a bill of particulars cannot cause an indictment that is sufficient on its face to become fatally flawed.  Dunlop v. United States, 165 U.S. 486, 491 (1897) (explaining that "[i]f the indictment be not demurrable upon its face, it would not become so by the addition of a bill of particulars").

The mail fraud statute was "enacted in 1872, as part of a recodification of the postal laws."  McNally v. United States, 483 U.S. 350, 356 (1987) (noting that "the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property").  The statute provides that

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

The Fourth Circuit has explained Mail fraud is established when the Government proves "that the defendant (1) knowingly participated in a scheme to defraud and (2) mailed, or caused to be mailed anything 'for the purpose of executing such scheme.'" United States v. Gillion, 704 F.3d 284, 294 (4th Cir. 2012) (quoting United States v. Pierce, 409 F.3d 228, 232 (4th Cir. 2005)); see also United States v. Murr, 681 F.2d 246, 248 (4th Cir. 1982); Pereira v. United States, 347 U.S. 1, 8 (1954). Courts have extensively considered the meaning and application of these two elements, and the words within each, over the past century. This Court examines each element in turn.

The Supreme Court first construed the meaning of the phrase "any scheme or artifice to defraud" two decades after 18 U.S.C. § 1341 was enacted. See Durland v. United States, 161 U.S. 306 (1896). The court held that the phrase should be interpreted broadly in the context of property rights. Id. Responding to the court's decision, Congress "codified the holding of Durland in 1909, and in doing so gave further indication that the statute's purpose is protecting property rights." McNally, 483 U.S. at 357.

The Supreme Court has long held that "to defraud" refers to "wronging one in his property rights by dishonest methods or schemes," and generally signifies "the deprivation of something of value by trick, deceit, chicane or overreaching." Hammerschmidt v. United States, 265 U.S. 182, 188 (1924). Congress's "codification of the holding in Durland in 1909 does not indicate that [it] was departing from this common understanding. . . . [T]he second phrase simply made it unmistakable that the statute

reached false promises and misrepresentations as to the future as well as other frauds involving money or property."[1] McNally, 483 at 358-59.

Defraud has been defined as causing "injury or loss to (a person or organization) by deceit." Black's Law Dictionary 516 (10th ed. 2014). Webster's similarly defines it as "to take or withhold from (one) some possession, right, or interest by calculated misstatement or perversion of truth, trickery, or other deception." Webster's Third New International Dictionary 593 (2002). Looking at the "common-law root of the federal fraud statutes," to be guilty of fraud, "an offender's purpose must be to injure." United States v. Sadler, 750 F.3d 585, 590 (6th Cir. 2014) (internal quotations omitted). In 2016, the Eleventh Circuit consulted these definitions and explained the difference between *deceiving* and *defrauding*. See United States v. Takhalov, 827 F.3d 1307, 1310 (11th Cir. 2016).[2] "[T]o *defraud*, one must intend to use deception to cause some injury; but one can *deceive* without intending to harm at all." Id. at 1312. Accordingly, "a schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick." Id. at 1313.

The Second Circuit reached the same conclusion in United States v. Regent Office Supply Co. Under the Government's theory of the case, "fraud may exist in a commercial transaction even when the customer gets exactly what he expected and at the price he expected to pay." 421 F.2d 1174, 1180 (2d Cir. 1970). The Regent court rejected the

---

[1] "[T]o the extent that the word 'property' is ambiguous as placed in § 1341, we have instructed that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" Cleveland v. United States, 531 U.S. 12, 25 (2000) (quoting Rewis v. United States, 401 U.S. 808, 812 (1971).

[2] In Takhalov, the defendants were convicted of wire fraud for tricking men to entering their clubs by hiring Eastern European women "to pose as tourists, locate visiting businessmen, and lure them into the defendants' bars and nightclubs." The Eleventh Circuit vacated the wire fraud convictions, holding that "18 U.S.C. § 1343 does not enact as federal law the Ninth Commandment given to Moses on Sinai. For § 1343 forbids only schemes to defraud, not schemes to do other wicked things, *e.g.*, schemes to lie, trick, or otherwise deceive." 827 F.3d at 1310.

Government's theory. Explaining that the purpose of a scheme to defraud "must be to injure," the court found that there was no proof any customer had actually been defrauded. Id. at 1181. "As a result of the transactions of which the untrue statements were a part, money and property changed hands." Id. "[F]alse representations were made, and . . . they were made by defendants' agents with knowledge of their falsehood." Id. According to the Government, an inference should be made that the customers "were induced to part with their money because of the false representations, and that such calculated inducement amount[s] to fraud" under 18 U.S.C. § 1341. Id. Accordingly, the court found that although an intent to deceive and even to induce was likely shown, that alone is not enough to "constitute the 'fraudulent intent' required by the statute." Id. The mail fraud statute requires "evidence from which it may be inferred that some actual injury to the victim, however slight, is a reasonably probable result of the deceitful representations if they are successful." Id. at 1182. Although the court found the defendants' "white lies repugnant[, they] . . . do not . . . constitute a scheme to defraud . . . punishable under section 1341." Id. at 1179.

"Thus, a 'scheme to defraud,' as that phrase is used in the wire-fraud statute, refers only to those schemes in which a defendant lies about the nature of the bargain itself." Takhalov, 827 F.3d at 1313. "But if a defendant lies about something else—e.g., if he says that he is the long-lost cousin of a prospective buyer—then he has not lied about the nature of the bargain, has not 'schemed to defraud,' and cannot be convicted of wire fraud on the basis of that lie alone."[3] Id. at 1314.

---

[3] "The elements of wire fraud under Section 1343 directly parallel those of the mail fraud statute, but require the use of an interstate telephone call or electronic communication made in furtherance of the scheme. United States v. Briscoe, 65 F.3d 576, 583 (7th Cir. 1995) (citing United States v. Ames Sintering Co., 927 F.2d 232, 234 (6th Cir. 1990) (per curiam)); United States v. Frey, 42 F.3d 795, 797 (3d Cir. 1994)

Indeed, the defendants in <u>Regent</u> "did not attempt to deceive their prospective customers with respect to the bargain they were offering; rather, they gave a false reason for being able to offer the bargain." 421 F.2d at 1182. Similarly, A defendant who merely induces a victim to enter into a transaction that he otherwise would have avoided is not guilty under the federal fraud statutes. <u>See</u> <u>Takhalov</u>, 827 F.3d at 1310 (citing <u>United States v. Starr</u>, 816 F.2d 94, 98 (2d Cir. 1987)).

The federal fraud statutes are "limited in scope to the protection of *property rights*, and *the ethereal right to accurate information doesn't fit that description*. Nor can it plausibly be said that the right to accurate information amounts to an interest that has long been recognized in property." <u>United States v. Sadler</u>, 750 F.3d 585, 591 (6th Cir. 2014) (citing <u>Cleveland v. United States</u>, 531 U.S. 12, 23 (2000)) (internal quotations and citations omitted). In <u>Sadler</u>, the defendant was convicted of wire fraud for lying to pharmaceutical companies when she ordered pills for the sham pain clinic she operated "by using a fake name on her drug orders and by falsely telling the distributors that the drugs were being used to serve 'indigent' patients." <u>Id.</u> at 590. Although the defendant "may have had many unflattering motives in mind in buying the pills," she did not intend to unfairly deprive "the distributors of their property." <u>Id.</u> Thus, the court found that in regard to the wire fraud count, the defendant "ordered pills and paid the distributors' asking price, nothing more." <u>Id.</u> But, "even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims 'received exactly what they paid for.'" <u>Takhalov</u>, 827 F.3d at 1314.

---

(wire fraud is identical to mail fraud statute except that it speaks of communications transmitted by wire)." U.S. Dep't of Justice, United States Attorneys' Manual 9-43.100 at 941 (1997).

The Supreme Court has held that, in regard to a scheme to defraud, "materiality of falsehood is an element of [the federal fraud statutes]." Neder v. United States, 527 U.S. 1, 25 (1999). "A misrepresentation is material if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" United States v. Gillion, 704 F.3d 284 (4th Cir. 2012) (quoting Neder, 527 U.S. at 22 n.5 (quoting Restatement (Second) of Torts § 538 (1977))).

The Fourth Circuit has found, "[i]t is essential to a conviction under these statutes that the victim of the alleged fraud actually have an interest in the money or property obtained by the defendant." United States v. Gray, 405 F.3d 227, 234 (4th Cir. 2005) (citing United States v. Adler, 186 F.3d 574, 576 (4th Cir. 1999)).

Prior to the McNally decision, various courts interpreted the fraud statutes broadly, including schemes to defraud victims of a variety of intangible rights, including a right to privacy and honest elections. Sadler, 750 F.3d at 591 (citing United States v. Murphy, 836 F.2d 248, 253-54 (6th Cir. 1988)). More than a decade before McNally, the Supreme Court recognized that the mail fraud statute had long been used as "a stopgap device" against fraudulent activity. United States v. Maze, 414 U.S. 395, 404-05 (1974) (C.J. Burger, Dissenting). Indeed, the Chief Justice argued that the mail fraud statute was an indispensible, all-purpose prosecutorial tool used against all sorts of evils before Congress could pass specific legislation outlawing those acts.[4] Id. at 405-06.

However, the Supreme Court froze "this expanding universe of intangible-right protections, limiting the fraud statutes' scope to rights that sounded in property." Sadler, 750 F.3d 585, 591. (citing Carpenter, 484 U.S. 19, 25; McNally, 483 U.S. at 360).

---

[4] *E.g.*, fraudulent securities transactions, loan sharking, fraudulent real estate sales and credit card fraud.

"Congress amended the fraud statutes to cover *some* intangible rights," but "it did not stretch the statute to cover the right to accurate information before making an otherwise fair exchange." Id. Accordingly, "Congress's reverberating silence about other intangible interests tells us all we need to know."[5] Sadler, 750 F.3d at 591.

McNally and its progeny make clear "that the federal mail fraud statute does not now make criminal, nor has it ever made criminal, the use of the mails in furtherance of schemes or artifices to defraud persons of non-property rights." United States v. Mandel, 672 F. Supp. 864, 873 (D. Md. 1987); see also Gray, 405 F.3d at 234 (citing Carpenter, 484 U.S. at 26-27) (noting that "[t]he Government need not prove that the victim suffered a monetary loss as a result of the alleged fraud; it is sufficient that the victim was deprived of some right over its property"). Property is generally considered to be "anything in which a person has a 'right that could be assigned, traded, bought, and otherwise disposed of.'" Gray, 405 F.3d at 234 (quoting United States v. Mancuso, 42 F.3d 836 (4th Cir. 1994)).

In 2000, a unanimous Supreme Court held that "§ 1341 does not reach fraud in obtaining a state or municipal license of the kind here involved, for such a license is not 'property' in the government regulator's hands. Again, as we said in McNally, '[i]f Congress desires to go further, it must speak more clearly than it has.'" Cleveland, 531 U.S. at 20 (quoting 483 U.S. at 360).

In Cleveland, the defendant was convicted under the mail fraud statute "for making false statements in applying to the Louisiana State Police for permission to operate video

---

[5] "[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in its prosecution of crimes." Cleveland, 531 U.S. 12, 25 (2000) (quoting Jones v. United States, 539 U.S. 848, 858 (2000); United States v. Bass, 404 U.S. 336, 349 (1971)); see Sadler, 750 F.3d at 591-92 (noting that the state already regulated the underlying criminal conduct that was found to be outside the federal mail fraud statute).

poker machines." Id. at 15. Concluding that such permits or licenses "do not qualify as 'property' within § 1341's compass[,]" the Supreme Court opined that it is not sufficient "that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." Id. The court noted that if it were to accept the Government's argument, "one could scarcely avoid the conclusion that states have property rights in any license or permit requiring an upfront fee, including drivers' licenses, medical licenses, and fishing and hunting licenses." Id. at 22. The court also explained that "[e]quating issuance of licenses or permits with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct *traditionally regulated by state and local authorities.* Id. (emphasis added). The Court intentionally, and unanimously, "resist[ed] the Government's reading of § 1341 as well because it invites [the Court] to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." Id. The court further noted the State of Louisiana provides its own statute that "unambiguously imposes criminal penalties for making false statements on license applications." Id. Indeed, a unanimous Supreme Court cautioned that the Government's reading of "the statute would appear to arm federal prosecutors with power to police false statements in an enormous range of submissions to state and local authorities." Id. at 26. Accordingly, without a "clear statement by Congress, [the Court] will not read the mail fraud statute to place under federal superintendence a vast array of conduct traditionally policed by the States." Id. at 27.

In United States v. Murphy, the Sixth Circuit reversed the defendant's eleven mail fraud convictions in "wake of the narrowing of the scope of [18 U.S.C. § 1341] by McNally."

836 F.2d 248, 251 (1988). The defendant's convictions arose from submitting bingo applications containing false information to the State of Tennessee. Specifically, the defendant set up a scheme where he provided false information to the state in order to obtain bingo licenses used to derive income for other than charitable purposes, in contravention of the state's statutory scheme. The defendant argued that the state had not been deprived of any property or money, and therefore, under McNally, no mail fraud had been committed. Id. at 251-52. The Government argued that not only was the license "property," but also the "right to object" was "an ancillary property right, inseparable from the existence of ownership." Id. at 252. The court ultimately found that "Tennessee's right to accurate information with respect to its issuance of bingo permits constitutes an intangible right and thus the scheme and artifice as charged in the indictment in support of the eleven counts of mail fraud does not state a crime . . . ." Id. at 254.

### III. THE INDICTMENT

Counts one through fifteen of the indictment comprise the mail fraud counts. Therein the Government charges that KAD operated "bingo and raffle games on behalf of FOP #83 and Berkeley County Humane Society, the licensed charitable organizations." ECF No. 1 at 1. Paragraphs two through seven describe various requirements imposed upon charitable bingo operators by the West Virginia Code. Paragraph eight contends, "Big Bucks Bingo conducted a charitable bingo and charitable raffle occasions in the name of FOP #83 in the calendar years 2010, 2011, 2012, 2013, and 2014." Charts detailing proceeds for both KAD and FOP #83 from 2010 through 2014 make up paragraphs nine and ten. In paragraph eleven, the indictment reads, "FOP #83 suffered a revocation of its charitable status on November 15, 2010 . . . ." Paragraphs twelve

through sixteen follow the exact same format, offering the same allegations, except they refer to the Berkeley County Humane Society ("BCHS"). Paragraph sixteen states that KAD had its exempt status revoked on April 2, 2015, effective January 1, 2011. Paragraph seventeen states that the individuals identified to the Tax Commissioner by Big Bucks Bingo as those charged with overall responsibility and as operators for bingo and raffle operations are not bona fide active members of the sponsoring charity—in violation of West Virginia law. Paragraph eighteen avers the applications for West Virginia bingo and raffle licenses state that KAD will use the proceeds for expenses.

Each of the Defendants is listed individually in paragraphs nineteen through twenty-five, along with their titles and a brief explanation of their roles relative to KAD and the bingo games. Paragraph twenty-six names all of the Defendants and alleges that they, "with the intent to defraud, devised a scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations and promises, *that is, that [KAD] is a bonafide charitable organization when, in fact, it never was*." (emphasis added).

Paragraph twenty-six is followed by an unnumbered paragraph titled "the scheme and artifice." The Government asserts that

> "[i]t was a part of the scheme and artifice to defraud that [KAD] would operate charitable bingo, super bingo, and raffle occasions for the charitable organizations[;] . . . [KAD] would obtain an annual license from the West Virginia Tax Commissioner for each bingo, super bingo, and raffle on behalf of the charitable organizations[;] . . . West Virginia Law governing the operation of charitable bingo and charitable raffle games was not followed[;] . . . [KAD] would keep in excess of 90% of the proceeds from these charitable bingo and rafle occasions while remitting less than 10% to the sponsoring charity[;] . . . [KAD] was not a charitable organization.

Id. at 7.

The following, untitled, paragraph indicates that all of the Defendants aided and abetted each other in devising, and with knowledge of its fraudulent nature, willfully participating in the "above described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations and promises." Id. at 8. The next three pages detail the "mailings to execute scheme." The remainder of the indictment deals with the money laundering and monetary transactions counts, which are inconsequential to the Court's current analysis.

## IV. DISCUSSION

The issue before this Court is "whether the allegations in the indictment, if proven, permit a jury to conclude that the defendant committed the criminal offense as charged." United States v. Akinyoyenu, 199 F. Supp. 3d 106 (D.D.C. 2016) (citing United States v. Sanford, Ltd., 859 F. Supp. 2d 102, 107 (D.D.C. 2012); United States v. Bowdoin, 770 F. Supp. 2d 142, 146 (D.D.C. 2011)). Here, the Defendants only challenge counts one through fifteen of the indictment, the mail fraud counts, because they are predicate offenses for the remaining thirty-seven counts. In other words, if the Court finds that the indictment fails to allege mail fraud as a matter of law, the indictment must be dismissed in its entirety.

The scheme and artifice described in the indictment alleges (1) multiple violations of the West Virginia Code and (2) a highly unequal proceeds sharing arrangement where KAD misrepresented itself as a charity.

As an initial matter, the Court notes that violations of the West Virginia Code pertaining to charitable bingo alone or in conjunction cannot establish mail fraud. The Supreme Court's unanimous decision in Cleveland was unequivocally clear: 18

U.S.C. § 1341 does not reach fraud in obtaining state licenses because it is not property as contemplated by the statute. 531 U.S. at 20. The defendant in <u>Cleveland</u> lied in applications submitted to the State of Louisiana to obtain video poker licenses. <u>See</u> <u>id.</u> at 15-17. The Court held "§ 1341 requires the object of the fraud to be 'property' in the victim's hands" and declined "to attribute to § 1341 a purpose so encompassing where Congress has not made such a design clear." <u>Id.</u> at 26. (noting that the Government's desired interpretation would give federal prosecutors the power to police false statements across a broad array of submissions to state and local authorities). Thus, under the facts set forth in the indictment, the Defendants cannot, even assuming every assertion is true, be convicted of mail fraud on a theory that they defrauded the State of West Virginia.

The indictment alleges KAD kept more than 90% of the proceeds from the charitable bingo and raffle occasions. These proceeds are certainly money for purposes of the statute. The question then turns on whether the indictment sufficiently pleads that FOP #83 or BCHS were defrauded or that a scheme to defraud ever existed.

The Court has already explained, at length, the history, definition, and application of defrauding within the framework of the federal fraud statutes, particularly mail fraud, dating back to the nineteenth century. However, some matters bear repeating.

Since <u>McNally</u>, courts have decided multiple cases that blatantly detail lying, deceiving, scheming and unlawful behavior that ultimately was found outside the scope of the mail fraud statute. <u>See, e.g.</u>, <u>Cleveland</u>, 531 U.S. 12 (lying on applications submitted to the state for video poker licenses); <u>McNally</u>, 483 U.S. 350 (requiring insurance agent hired to provide policies for the state share premiums with insurance agency in which defendants had an interest); <u>Maze</u>, 414 U.S. 395 (stealing roommate's

credit card and fraudulently using it on countrywide trip); Takhalov, (tricking men into defendants' clubs by hiring women to lure them inside while concealing the relationship between the women and the club); Murphy, 836 F.2d 248 (lying on applications to the state to procure bingo licenses); Regent Office Supply Co., 421 F.2d 1174 (soliciting purchases using false pretenses); Sadler, 750 F.3d 585 (lying to pharmaceutical distributors about defendant's true identity and that drugs were being used to help indigent patients, when defendant was in fact running an illegal pill mill).

Clearly, mail fraud does not punish mere deceit of another person or entity—there must be more. "To be guilty of fraud, an offender's purpose must be to injure, a common-law root of the federal fraud statutes." Sadler, 750 F.3d at 590 (citing Neder, 527 U.S. 21-25) (internal quotations and citations omitted).

Accordingly, upon careful consideration of the indictment, this Court finds that the allegations in the indictment, if proven, would not permit a jury to conclude that the defendants committed mail fraud in violation of 18 U.S.C. § 1341. The indictment fails to adequately allege a scheme and artifice to *defraud*. There is no allegation that the Defendants contemplated, intended, or could foresee injury, or did in fact injure, anyone.

The Government has clearly alleged numerous violations of the West Virginia Code, and taking the allegations as true, the Defendants made misrepresentations to the state in various applications submitted to the State of West Virginia for bingo and raffle licenses. Yet, Cleveland makes abundantly clear that this conduct in and of itself is not cognizable under 18 U.S.C. § 1341. However, the indictment establishes a different argument; the Government asserts FOP #83 and BCHS were the victims of Defendants' scheme. The indictment states, the Defendants "with the intent to defraud, devised a

scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations and promises, *that is*, *that [KAD] is a bonifide charitable organization when, in fact it never was*." ECF No. 1 at 7. Inasmuch as the Government alleges KAD made misrepresentations to FOP #83 and BCHS about its charitable status, and taking all of the allegations contained within the indictment as true, the Government cannot obtain a conviction for federal mail fraud under the law.

The Defendants' alleged victims do not have a property right, as recognized by § 1341, to the truth. See Cleveland 531 U.S. at 23; McNally, 483 U.S. at 360; Sadler, 750 F.3d at 591. Moreover, any lies must be material and go to the heart of the bargain. Based upon the indictment, the lie alleged is akin to those in Cleveland, Regent, Sadler, and Takhalov. Clearly the Defendants received the vast majority of the proceeds derived from the bingo games and raffles. However, the indictment states that the Defendants conducted "charitable bingo and charitable raffle occasions in the name of [FOP #83 and BCHS from 2010 through 2014]." Taken on its face, the indictment alleges a scheme where the Defendants used the charities to obtain licenses so that the Defendants could conduct charitable bingos and raffles, in violation of state law, and they distributed a portion of the proceeds to the charities in return. There is no allegation that the charities were injured in any way. In fact, the charities benefited from the scheme by receiving a portion of the proceeds they otherwise would not have received had the Defendants not used their charities to obtain licenses. The misrepresentation in the instant case is not material and does not go to the heart of the bargain as to any arrangement between the Defendants and the charities. Accordingly, the indictment fails to demonstrate a scheme

or artifice to *defraud*.  Whatever the criminal conduct described in the indictment may be, it is not federal mail fraud.

## V. CONCLUSION

Because the remaining counts of the indictment rely upon a violation of 18 U.S.C. § 1341 as a predicate offense, those counts, sixteen through fifty-two, necessarily fail as a matter of law.

Therefore, upon review and consideration of the parties' submissions and the law, the Defendants' Motion to Dismiss Indictment [ECF No. 159] is hereby **GRANTED WITHOUT PREJUDICE**.  The Clerk of Court is **DIRECTED** to **DENY AS MOOT** any outstanding motions, and hereby **ORDERED** to **STRIKE** this case from the Court's active docket.

The Clerk is further **DIRECTED** to transmit copies of this Order to all counsel of record herein.

**DATED:** March 24, 2017

GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE